UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VICTOR SEQUEIRA, | § | |
| | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| v. | § | CIVIL ACTION NO. H-07-cv-03036 |
| | § | |
| KB HOME, KB HOME LONE STAR, | § | |
| INC., KB HOME HOUSTON,  and KB | § | |
| HOME HOLDINGS, INC., | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM AND ORDER

Before the Court is Defendants' Motion for Summary Judgment.  (Doc. No. 33.)  After considering the parties' filings, all responses and replies thereto, and the applicable law, the Court finds that Defendants' Motion should be denied.

### I.      BACKGROUND

#### A.  Plaintiff's Employment with KB Home Houston

Plaintiff Victor Sequeira alleges that he was wrongfully terminated by Defendant KB Home Houston for engaging in activities protected under Section 806 of the Sarbanes-Oxley Act, which provides whistleblower protection.   On August 16, 2006, Plaintiff began work at Defendant KB Home Houston as a Senior Marketing Manager.  (Doc. No. 33, Ex. 6 ¶ 3.)[1]   KB Home Houston is a division of KB Home, a publicly-held corporation that manufactures homes and provides mortgage financing.  (Pl. Compl. ¶ 16; ¶¶ 46-50.)  As described in KB Home Houston's job announcement, the position of Senior Marketing Manager entailed marketing research  and  analysis  of  in-house  and  competitor  best  practices,  development  and

---

[1] Except as noted, these facts are either undisputed or, for the purposes of this motion only, presented in the light most favorable to Plaintiff.

implementation of the department's operational guidelines, enhancement of creative target market advertising techniques, and strategic community involvement planning. (Doc. No. 33, Ex. 5.) Plaintiff came to the position with many years of experience as an analyst and manager at publicly traded companies, including Hewlett Packard and Reliant Energy. (Doc. No. 36, Ex. G.) While Plaintiff worked at KB Home Houston, his immediate supervisor was Dawn Harrington, who served as the Acting Marketing Director until she was made the permanent Marketing Director in early October 2006. (Doc. No. 33, Ex. 6 ¶ 2.) Harrington reported to Senior Vice President Dale Ahrendt, who reported to Joe Zimmerman, the President of KB Home Houston. (*Id.*)

Plaintiff's tenure at KB Home Houston lasted only seven weeks. The parties dispute the facts surrounding Plaintiff's employment. On August 19, 2006, Plaintiff sent an email to the marketing department with suggestions for a "Marketing Top Ten" list of priorities. (Sequeira Dep. 125:16-19, July 11, 2006; Doc. No. 33, Ex. 6-B.) Plaintiff asserts that he developed the list with Harrington's approval and endorsement (Sequeira Dep. 123:11-12), and that he sent the list to Harrington for approval in its final form before he sent it to the marketing department. (*Id.* at 122:8-17.) Harrington contends that the list was sent to the marketing department without her approval and that it incorrectly identified which individuals were responsible for certain tasks. (Doc. No. 33, Ex. 6 ¶ 5.) In response to the "Marketing Top Ten" list, Harrington sent Plaintiff an email praising his "leadership" and requesting "to talk about his approach in more detail." (*Id.* at Ex. 6-B.) On August 24, 2006, Plaintiff attempted to schedule a meeting between Zimmerman and the *Houston Business Journal* without copying Harrington. (*Id.* at Ex. 8.)

On August 31, 2006, Plaintiff terminated KB Home Houston's contract with Kenny Pleasant. Pleasant had a Model Maintenance Contract with KB Home Houston to replace and

2

repair furniture and accessories in the division's model homes, to maintain garage merchandise, and to work at "Happy Homes" events. (Doc. No. 33, Ex. 13.) The contract required Pleasant to submit invoices and receipts every Tuesday. (*Id.*)

Plaintiff inquired into Pleasant's role, and no one seemed to know what Pleasant was doing or how much the marketing department was spending on his contract. (Sequeira Dep. 110:1-9.) Plaintiff came to believe that Pleasant was submitting false invoices because he had a personal relationship with the KB Home employee who oversaw his contract. Plaintiff believed this relationship was a conflict of interest and also believed that Pleasant's invoices lacked the kind of detail that would be expected in a contractual relationship. (*Id.* at 110:15-25; Doc. No. 33, Ex. 2 ¶ 1.) Additionally, Pleasant allegedly transferred inventory from the Houston division to the Valley division without proper authority. (*Id.* at 111:12-21.) Plaintiff had no specific knowledge that Pleasant was submitting fraudulent invoices; at the very least, however, he believed that Pleasant was violating his contract and that the potential for fraud existed. (*Id.* at 111:1-7.)

Harrington felt that Plaintiff acted in an unprofessional manner when he terminated Pleasant's contract. (Doc. No. 33, Ex. 6 ¶ 4.) Specifically, she found Plaintiff's termination letter to Pleasant, in which he stated that payment would be conditional on Pleasant's submitting a work status report and "notice of any outstanding issues," to be a heavy-handed manner of dealing with a vendor with whom the company might do business in the future. (*Id.*)

On September 7, 2006 (Doc. No. 33, Ex. 6-C), Plaintiff again emailed the entire marketing department, this time attaching a "vendor spreadsheet," that detailed the department's expenses for a particular period of time. (Sequeira Dep. 127:1-6.) KB Home Houston's finance department created the spreadsheet at Plaintiff's request. (*Id.*) He sent a copy of the spreadsheet

3

to Ahrendt and David Sprouse, the Vice President of Finance.   (Doc. No. 33, Ex. 6-C.)

Harrington criticized Plaintiff for distributing the vendor spreadsheet to the entire marketing

group. (Sequeria Dep. 144:19-145:11.)  She sent him an email asking to "talk about this next

time" and stated that she was "not sure an email is at all the right way to send this to the team."

(Doc. No. 33, Ex. 6-D.)  She told him that the entire marketing staff did not need to know the

information, and later, at a staff meeting, she asked the team to destroy their copies of the

document.   (Sequeira Dep. 132:2-15.)   She instructed Plaintiff to include her in his

communications to her superiors, Ahrendt and Zimmerman, and corporate level employees.

(Doc. No. 33, Ex. 6 ¶ 6; Ex. 6-E.)

The next day, September 8, 2006, Plaintiff emailed Ahrendt and David Sprouse, the Vice

President of Finance, without copying Harrington, about inventory that Pleasant had transferred

to KB Home's Valley division.  (*Id.* at Ex. 6-E.)  On September 15, 2006, Plaintiff emailed the

marketing department and Ahrendt a "Marketing Summary" without first informing Harrington.

(*Id.* at Ex. 6 ¶ 8; Ex. 6-F.)   Harrington responded to the email, copying Ahrendt, by praising

Plaintiff's "passion for sharing information" but requesting that he discuss his "approach" prior

to sending it out in the future.  (*Id.* at Ex. 6-G.)  Ahrendt instructed Plaintiff that he needed to

keep Harrington "looped in" to ensure that they were all "on the same page" in the future.  (*Id.*)

Defendants allege that Plaintiff had a number of problems with KB Home's internal

advertising agency, a part of KB Home's corporate parent company.   (*Id.* at ¶ 10.) Plaintiff

denies that he had conflicts with other employees in the first month of his employment.

(Sequeira Dep. 145:12-15.)  In August, Galit Shokrian, the Vice President of Marketing in

charge of the internal agency, allegedly contacted Harrington to complain about an email

Plaintiff had sent to her staff regarding a Labor Day promotion, which they had found offensive.

(Doc. No. 33, Ex. 6 ¶ 10.)  Harrington had Plaintiff forward a copy of the email to her on August

29, 2006.  (*Id.* at Ex. 6-I.)  When he forwarded the email to Harrington, Plaintiff commented that

he was "not sure why they were offended."  (*Id.*)  In September, Shokrian allegedly contacted

Harrington again about an email from Plaintiff that her staff found "overly confrontational."  (*Id.*

at Ex. 6 ¶ 10.)  Harrington shared the email with Zimmerman, who characterized it as

"unacceptable communication," and "disrespectful, condescending, and rude."  (*Id.* at Ex. 6-J.)

### B.  The "SOX Spreadsheet"

The parties also dispute the facts surrounding the "SOX Spreadsheet"[2] that Plaintiff was

asked to initial. (Doc. No. 33, Ex. 15.)  According to David Sprouse, the SOX Spreadsheet was

generated by Defendants' Regional Accounting Center ("RAC"), and it was to be completed and

submitted to the RAC on or around the 20th of every month.  (Sprouse Dep. 17:6-23, Oct. 17,

2008.)  It was used every month to ensure that KB Home's policies and procedures had been

followed.  (*Id.* at 16:18-21.)  The individuals responsible for ensuring compliance had to initial

the checklist beside the items for which their division was responsible.  (*Id.* at 16:24-17:2.)  In

August 2006, the SOX Spreadsheet contained 58 items (Doc. No. 33, Ex. 15); of those items,

Sprouse identified four that he considered related to the company's Sarbanes-Oxley key

controls.[3]  (Sprouse Dep. 26:1-27:18.)

On September 14, Alan Pham, an analyst in the finance department (Pham Dep. 26:12,

Oct. 6, 2008) took the SOX Spreadsheet to each department to have the appropriate person initial

beside his department's responsibilities.   Plaintiff was responsible for two items: "Provide

---

[2] The parties dispute whether this document was actually referred to as the "SOX Spreadsheet" by KB Home employees.  Since we must construe the facts in light most favorable to Plaintiff, we refer to the document as the "SOX Spreadsheet."

[3] According to David Sprouse, the four items related to KB Home's Sarbanes Oxley compliance were "VP of Finance reviews financial statements, reporting package, including supplemental financial schedule" (Sprouse Dep. 23:1-5); "Review of significant items identified by the IT Exceptions Report" (*Id.* at 23: 17-22); "Division holds monthly land and off-site meetings" (*Id.* at 26:1-6); "VP of Finance will update the invoice approval list and communicate changes via an addendum or revised list to the RAC regularly" (*Id.* at 26:19-15).

detailed model budgets for new model complexes to the RAC within 30 days of the approved land package" (Sequeira Dep. 224:18-21), and "Provide approved Model Budget Adjustment Forms to the RAC for all budget changes." (*Id.* at 230:6-7.)

Plaintiff asked Pham to find out what the document was used for so that he would know what he was signing. (Pham Dep. 71:6-11.) Plaintiff was concerned about initialing the boxes, because he had terminated the division's contract with Pleasant based on suspicious invoices, and Pleasant's work had been calculated in the model maintenance budgets. (Doc. No. 33, Ex. 2 ¶ 1.) He therefore had concerns about the accuracy of the document and believed that the problem he discovered with Pleasant was "global in nature." (*Id.*)

Later that day, Pham returned with Mark Eubanks, a Finance Manager, and again asked Plaintiff to sign the spreadsheet. (*Id.*) Plaintiff said he could not sign without reviewing corroborating documentation. (*Id.* at Ex. 2 ¶¶ 43-44.) He asked for more information to understand the entries; specifically, he requested an "AS400"[4] for the past six months. (*Id.* at Ex. 17.) Eubanks responded by sending him the details for four accounts. (*Id.* at Ex. 18.) Plaintiff does not know if he was ultimately provided with all the information he requested. (Sequeira Dep. 230:21-231:9.)

Plaintiff then met with David Sprouse and told him that he needed more time to digest the information before he signed the spreadsheet. (*Id.*)    Sprouse contends that he explained to Plaintiff that no new budget sheets or revisions had been prepared in the past month, so there was nothing Plaintiff needed to review. (Sprouse Dep. 29:8-30:6.) Plaintiff argues that Sprouse never told him that there were no new land deals that needed a budget. (Doc. No. 33, Ex. 2 ¶

---

[4] AS400 is the computer system that KB Home Houston used, at the time, to manage its finances and accounting. (Sprouse Dep. 35:8-14.)

51.)  Sprouse gave Plaintiff the option of signing the spreadsheet "Not in Current Month" or having Ahrendt sign the spreadsheet.

Pham and Eubanks later returned to Plaintiff's office and again asked him to sign the sheet.  They told him it was "highly important" and "mandatory" that he sign.  (Sequeira Dep. 234:9-13.)  As some point, Plaintiff learned from them that the document was used for the company's Sarbanes-Oxley compliance.  (Sequeira Dep. 234:17.) Pham and Eubanks again told him he could respond "Not in the Current Month"; Plaintiff was not sure that would be an accurate representation.  (Doc. No. 33, Ex. 2 ¶ 1.)  They assured him that he would get additional information to confirm the spreadsheet and that a meeting would be scheduled to discuss the spreadsheet and its use.  (*Id.*)  Based on these assurances, Plaintiff initialed the spreadsheet.  (*Id.*; Doc. No. 33, Ex. 15.)  Given that Plaintiff was such a new employee, he did not think that he could refuse to sign the document.  (Doc. No. 33, Ex. 2 ¶ 6.)

On October 3, Plaintiff attended a meeting with Ahrendt, Harrington, and Zimmerman, in which Ahrendt expressed concern about the SOX Spreadsheet.  Ahrendt said that if everyone did not sign the spreadsheet, then KB Home corporate would audit the division's accounting practices and internal controls.  (*Id.* at Ex. 2 ¶ 8.)  Ahrendt stated that he was concerned about the number of cancellation backlogs the division had, and that the accounting controls were "a can of worms" that he did not want to open, because it would trigger a corporate audit.  (*Id.*)

### C.  Plaintiff's Meeting with Zimmerman

On September 21, 2006, Stefani Farris, a marketing department employee, sent Plaintiff a draft of an email to Kenya Burgess, recapping a meeting that the three had had earlier.  (*Id.* at Ex. 6 ¶ 11.)  Plaintiff modified the email and sent it to Farris, Burgess, and Harrington.  (*Id.* at Ex. 6 K-L.)  Burgess was so offended by the email that she was allegedly reduced to tears.  (*Id.*)

Also on September 21, 2006, Plaintiff sent Harrington an email, advocating that KB Homes not pursue a deal with Casa Nueva homes. (*Id.* at Ex. 6-H.) Plaintiff made this decision without first contacting Kenya Burren, who was in charge of the Casa Nueva deal. (*Id.* at Ex. 6 ¶ 9.) Harrington forwarded this email to Zimmerman, who was angered by Plaintiff's decision, noting that it was "not [Plaintiff]'s call…it is Kenya's." (*Id.*) In a later email, Zimmerman exclaimed that Plaintiff was not a "team player." (*Id.*)

On the same day that these controversial emails were exchanged, Zimmerman met with Plaintiff. (Doc. No. 33, Ex. 2 ¶ 40.) Plaintiff told Zimmerman that there had been no accountability for Pleasant's expenses, and Zimmerman concurred that it had been correct to terminate Pleasant. (*Id.* at Ex. 2 ¶ 4.) Plaintiff informed Zimmerman of his concerns about the marketing department's expenses and the lack of "internal controls." (*Id.* at Ex. 2 ¶ 14.) He discussed KB Home Houston's marketing department's payments to D & R Signs, an advertising vendor, including the company's purchase of $50.00 soap dishes from D & R Signs. (Sequeira Dep. 163:1-8.) Zimmerman asked Plaintiff if Ahrendt was aware of the division's D & R Signs expenditures (Doc. No. 33, Ex. 2 ¶ 2), and Plaintiff stated that he and Ahrendt were scheduled to meet with the D & R upper management on September 25. (*Id.* at 163:10-12.) Plaintiff also told Zimmerman that the company did not have a proper method of tracking vendor expenditures or contracts. (Sequeira Dep. 166:21-22.) Specifically, he informed Zimmerman that Ahrendt had thought one particular vendor, Stan Crane, had been submitting high invoices, and that Ahrendt and he had met with Stan Crane. (*Id.* at 167:5-18.)

On September 22, Harrington met with Plaintiff to discuss his alleged communication problems and other performance issues. (*Id.* at Ex. 6 ¶ 12.) She told him that "this just isn't working out" and advised him that if he wanted to keep his job, he had to change "everything."

(*Id*. at Ex. 2 ¶ 2.)  Plaintiff insisted that Ahrendt be called into the meeting.  (*Id*. at Ex. 6 ¶ 12.)  Ahrendt, yelling, advised Plaintiff that he fully supported Harrington, "after the phone call I received from Joe Zimmerman yesterday."  (*Id*. at Ex. 2 ¶ 2.)  Ahrendt indicated that he was offended that Sequeira had discussed the company's relationship with D & R Signs with Joe Zimmerman.  (Sequeira Dep. 163:17-164:8.)  Harrington then told Plaintiff that he had to commit to improve and to let her know by Monday if he would.  (*Id*.)

The next Monday, September 25, 2006, Plaintiff informed Harrington that he would make an effort to improve.  Harrington responded by issuing Plaintiff a Performance Improvement Plan ("PIP").  (*Id*. at Ex. 6-M.)  The PIP listed three "Unsatisfactory Areas of Responsibility."  First, it stated that Plaintiff had been employed for thirty days and had failed to complete any of the required certifications.  Second, it directed him to work on his communication skills, noting that there had been "a number of complaints that Victor has been condescending and rude in his emails as well as dialogue."  (*Id*.)  Third, the PIP stated that Plaintiff needed to make sure he was "following instructions" because his attempt to "take over action items" and assign duties had led to confusion and frustration.

The PIP outlined how Plaintiff should improve his performance.  First, he was to complete all certification requirements within two weeks.  Second, he was not to respond to any emails when frustrated or mad, and he was instructed to include Harrington on any communication that could "lead to confrontation."  Finally, he was to follow Harrington's instructions on projects, and he was prohibited, until further notice, from sending out any information until it had been approved by Harrington.  (*Id*.)  Plaintiff failed to sign the PIP.  (*Id*. at Ex. 6 ¶ 14) because he felt that it did not outline attainable goals.  (*Id*. at Ex. 2 ¶ 39.)  He also felt that it was Harrington's effort the scare him.  (*Id*. at ¶ 5.)

On the same day Harrington issued the PIP, Plaintiff attended a scheduled meeting with D&R Signs representatives to discuss the department's expenses and the lack of a purchase agreement. (*Id.* at Ex. 2 ¶ 1.) Plaintiff had previously invited Ahrendt to attend; Harrington told him not to, and after the meeting began, she dismissed the rest of the marketing staff in attendance except Plaintiff. Plaintiff began to discuss the division's expenditures with D & R signs and the lack of a purchase agreement, which he believed was a violation of KB Home's policy. (*Id.* at Ex. 2 ¶¶ 17-18.) Harrington asked him for the vendor's file, and dismissed him from the meeting. This fueled Plaintiff's concern regarding the company's internal controls.

Harrington alleges that, the day after she issued the PIP, Plaintiff was sarcastic and confrontational in an email communication to David Sprouse regarding company discounts. (*Id.* at Ex. 6 ¶ 14; Ex. 6-N.) On September 28, 2006, Harrington alleges that Plaintiff attempted to schedule a meeting between himself, Zimmerman, and representatives from Remington Ranch Sign, without seeking prior approval from Harrington. (*Id.* at Ex. 6 ¶ 15; Ex. 6-O.) Plaintiff contends that Zimmerman initiated the meeting. (*Id.* at Ex. 2 ¶ 40.) Additionally, Plaintiff asserts that he was never forbidden from meeting with Zimmerman. (*Id.*) Again on October 2, 2006, Plaintiff attempted to schedule a meeting between Zimmerman, himself, and representatives from Staubach Company without first consulting Harrington. (*Id.* at Ex. 6 ¶ 15; Ex. 6-P.)

### D. Plaintiff's Termination

Following these events, it became clear to Harrington that Plaintiff was not going to change his behavior; she therefore decided to terminate his employment. (*Id.* at Ex. 6 ¶ 16.) She scheduled a meeting with Plaintiff and Ahrendt for October 3, but Plaintiff did not attend. (*Id.*; Ex. 6-Q.)

On October 4, Plaintiff met with Dale Ahrendt. (Doc. No. 33, Ex. 20.) Plaintiff surreptitiously recorded the conversation. (Sequeria Dep. 240:15-241:3.) Plaintiff and Ahrendt discussed Pleasant's contract. Ahrendt acknowledged that Pleasant's personal relationship with the staff had created a problem. (Doc. No. 33, Ex. 20.) Plaintiff informed Ahrendt that there was no documentation on what Pleasant had bought and stored, and pointed out that Pleasant took inventory from the Houston division to the Valley division without approval. (*Id.*) He informed Ahrendt that "we don't know what we don't know" and that KB Home Houston was not prepared for "a rude awakening." (*Id.*) Ahrendt then stated that he thought they should move forward and that he was just trying to better understand what Pleasant was supposed to have done for the company.

Plaintiff then shifted the conversation to the SOX Spreadsheet. (*Id.*) Plaintiff informed Ahrendt that he was "not comfortable" with the spreadsheet because he had not received the requested feedback on the process. Ahrendt then asked who had not given him feedback, and Plaintiff responded that he "did not want to name names." (*Id.*) He told Ahrendt that he wanted to have a discussion about the spreadsheet, but that he did not want to offend anyone, and that Harrington had instructed him not to initiate meetings or discussions where his questions might "be perceived improperly." (*Id.*) Ahrendt replied that it was not a question of his "offending," but of making sure that certain people were "in the loop." (*Id.*) Ahrendt explained that they had had problems in the past when Plaintiff had scheduled meetings without involving his manager, which appeared "exclusionary" or "off to one side." (*Id.*)

Plaintiff then asked Ahrendt what steps he should take to better understand his responsibilities surrounding the spreadsheet. Ahrendt instructed him to "sit down with his manager," because "at the end of the day, she's responsible for what's on the spreadsheet." (*Id.*)

He informed Plaintiff that Harrington had recently had a "cursory" meeting with Sprouse to discuss the current budget.  Ahrendt noted that this had not been previously happening, or if it had been happening previously, it was "extremely haphazardly."  (*Id.*)  Plaintiff stated that he had "inherited a situation that was outside of his control" and that he was ready for the "accounting side" of his job to be over, because he was "really nervous" being responsible for matters about which he did not have full information.  Ahrendt assured him that the company would not hold him accountable for something he did not create or sanction.

Harrington and Ahrendt then met with Plaintiff on October 5, 2006, to discuss his employment.  Ahrendt and Harrington felt that the meeting would likely result in Plaintiff's termination, but if Plaintiff made a commitment to turn his behavior around and acknowledged his problems, he would not necessarily be terminated.  (Ahrendt Dep. 121:18-122:3, Oct. 21, 2008.)  Harrington began the meeting by saying "this isn't working out."  (Doc. No. 33, Ex. 6 ¶ 16.)  Plaintiff responded, "According to you," and left the meeting.  (*Id.*)  Plaintiff denies making this statement (*Id.* at Ex. 2 ¶ 41); instead, he claims that he excused himself from the meeting so that Ahrendt would not yell at him.  He did not learn that he had been terminated until later in the day, when Jen Rothfield, Senior Director of Human Resources, contacted him regarding a severance package.  (*Id.* at Ex. 2 ¶ 1.)  He informed Rothfield about his concerns regarding KB Home Houston's lack of internal controls and Sarbanes-Oxley compliance.  Rothfield assured him that she would investigate these allegations.  Plaintiff was terminated for insubordination on October 5, 2006.  (*Id.* at Ex. 19.)

Rothfield investigated Plaintiff's complaints.  During this period of time, Plaintiff emailed several KB Home corporate executives about the irregularities in the Houston division.  (*Id.* at Ex. 2, ¶ 1.)  On October 16, Rothfield contacted him and told him that she had met with

the Houston staff and had done "follow up" to avoid future mistakes.  She informed him that he could not return to work.

### E.  Procedural Posture

Plaintiff filed a complaint with the Occupational Safety and Health Administration ("OSHA") within 90 days of his termination.  (Pl. Compl. ¶ 27.)  On August 28, 2007, Plaintiff notified the Administrative Law Judge, pursuant to 29 C.F.R. § 1980.1 14(b), that he intended to file his Sarbanes-Oxley claims in federal court and requested that the ALJ stay the administrative proceeding.  (*Id.* at ¶ 30.)  Plaintiff filed this action more than 180 days after he filed the OSHA complaint (*Id.* at ¶ 28) and before the ALJ issued a final decision.  (*Id.* at ¶ 29.) This court has jurisdiction pursuant to 28 U.S.C. § 1331.

### II.   ANALYSIS

#### A.  Summary Judgment Standard

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented.  FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).  A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party.  *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).  The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Id.*  Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary

judgment evidence.  F.R.C.P. 56(e)(1); *See, e.g., Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## B. Sarbanes-Oxley

Section 806 of Sarbanes-Oxley creates a private cause of action for employees of publicly-traded companies that are retaliated against for engaging in protected activity.  18 U.S.C. § 1514A.  The statute states, in relevant part:

> No [publicly-traded company] ... may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee (1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of [18 U.S.C.] section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by (C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct) ....

18 U.S.C. § 1514A(a)(1)(C).  In order to establish a claim, an employee must prove by a preponderance of the evidence (1) that he engaged in protected activity; (2) his employer knew he engaged in that activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action.  *Allen v. Administrative Review Bd.*, 514 F.3d 468 (5th Cir. 2008) (citing *Collins v. Beazer Homes USA, Inc.*, 334 F.Supp. 2d 1365, 1379 (N.D. Ga. 2004)).  If the employee establishes these four elements, the employer may still avoid liability by proving, by clear and convincing evidence, that it would have taken the same unfavorable personnel action in the absence of the protected behavior.  *Id.*

Plaintiff alleges that he engaged in protected activity by reporting the marketing division's lack of internal accounting controls to his superiors, and by questioning the accuracy of the SOX Spreadsheet. Defendants argue that Plaintiff did not engage in protected activity because he did not actually believe that fraudulent acts were being committed, and, even if he did posses this belief, his complaints to management did not constitute "protected activity." Defendants also contend that KB Home Houston has presented clear and convincing evidence that it would have terminated Plaintiff even in the absence of his alleged protected behavior.

### i. Protected Activity

Sarbanes Oxley prevents publicly-traded companies from retaliating against an employee who reports information to a superior "regarding any conduct which the employee reasonably believes constitutes a violation" of one of six enumerated categories in § 1514A. 18 U.S.C. § 1514A(a)(1). The complaint must "definitively and specifically relate" to one of these categories, which include: (1) 18 U.S.C. § 1341 (mail fraud); (2) 18 U.S.C. § 1343 (wire fraud); (3) 18 U.S.C. § 1344 (bank fraud); (4) 18 U.S.C. § 1348 (securities fraud); (5) any rule or regulation of the SEC; or (6) any provision of federal law relating to fraud against shareholders. *Allen*, 514 F.3d at 476-477. Plaintiff avers, in his Complaint, that his protected activity relates to all six enumerated categories.

### 1. Plaintiff's Reasonable Belief

The Court scrutinizes the employee's "reasonable belief" that a violation occurred under both a subjective and objective standard. *Id.*, 514 F.3d at 477. The objective reasonableness of a plaintiff's belief is evaluated based on the knowledge available to a reasonable person in the same factual circumstances, with the same training and experience as the aggrieved employee. *Id.* (citations omitted). The Fifth Circuit has equated the "objective reasonableness" standard to

be used in Sarbanes-Oxley cases with the standard used in the Title VII retaliation context. *Id.* The objective reasonableness of an employee's belief therefore cannot be decided as a matter of law if there is a genuine issue of material fact, meaning that "reasonable minds could disagree on [the] issue." *Id.* at 477-478 (citing *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1188 (11th Cir. 2001)).

In addition, the sixth enumerated category of protected activity requires some form of scienter related to fraud. *Id.* at 478.   For this sixth category, the employee must reasonably believe that his or her employer acted with a mental state embracing intent to deceive, manipulate, or defraud its shareholders. *Id.* The Fifth Circuit has declined to rule on whether the other five categories require a defendant to believe that the fraud was motivated by scienter.  The Court of Appeals recognized in *Allen*, however, that several Administrative Law Judges have interpreted the statute as requiring scienter for all five categories. *Id.* In *Livingston v. Wyeth*, 520 F.3d 344 (4th Cir. 2008), the Fourth Circuit recently held that all five categories require the employee to believe that the fraud was intentional.

Since Plaintiff does not specifically relate his claim to one of the first five categories, but rather alleges that the company was violating federal law related to shareholder fraud, the Court considers Plaintiff's complaint under the sixth category.   The issue is whether Plaintiff had a reasonable belief that KB Home Houston was intentionally deceiving its shareholders. Defendants argue that Plaintiff's belief is objectively unreasonable because his knowledge of accounting standards and internal controls is admittedly drawn from the media coverage of the Enron trial and his conversations with former Enron and Arthur Anderson employees. (Sequeria Dep. 187:20-24.)

Plaintiff also testified, however, that while working at two other major corporations, Hewlett Packard and Reliant, he was to some degree exposed to their Sarbanes-Oxley compliance procedures.[5] While a senior analyst at Hewlett Packard (Sequeira Dep. 290:1-5, Oct. 24, 2008), he handled priority lists that were sometimes related to Sarbanes-Oxley compliance and internal controls. (*Id.* 289:12-14.) He did not make any decisions about which internal controls were related to the company's Sarbanes-Oxley requirement and did not receive any formal training on Sarbanes-Oxley or internal controls. (*Id.* at 290:7-18.) At Reliant, he had tracked the company's billing and revenue components, which he considered to be internal controls. No one ever told him they were internal controls, and he never received any formal training on internal controls or Sarbanes-Oxley. (*Id.* at 320:1-18.) He was never responsible, at either company, for determining what was considered an "internal control." (*Id.* at 323:17-20.) His understanding of the term "internal control" is derived from the media coverage of the Enron scandal. (*Id.* at 321:1-9.)

We are unable to find, as a matter of law, that Plaintiff's belief that KB Homes was intentionally engaging in activity that amounted to shareholder fraud is objectively unreasonable. The statute does not require, as Defendants suggest, that the whistleblower have a specific expertise. *Mahony v. KeySpan Corp.*, No. 04 CV 554 SJ, 2007 WL 805813 at *6 (E.D.N.Y. Mar. 12, 2007). An employee's reasonable but mistaken belief that the employer violated a federal law relating to securities fraud is protected. *Allen*, 514 F.3d at 477. While Plaintiff does not have any formalized training in accounting or Sarbanes-Oxley compliance, he does have experience working at other publicly-held companies. In his former positions, he did have some

---

[5] Plaintiff initially refused to specifically comment on the exposure he had to Sarbanes Oxley during his previous employment because of confidentiality agreements with former employers. (Sequeria Dep. at 188:14-23.) In a later deposition, however, Plaintiff discussed his experience with Sarbanes-Oxley and internal control issues while working at Hewlett Packard and Reliant.

exposure to those companies' practices regarding Sarbanes-Oxley and implementing internal controls. He is not an accounting expert, but a reasonable jury could find that his experience was sufficient, in this situation, for him to identify areas where he believed the company was violating securities laws related to shareholder fraud. *Cf. Day v. Staples, Inc.*, 573 F.Supp.2d 336 (D. Mass. 2008) (finding that an employee who graduated from college the day before his employment began, and who had no relevant work experience, did not have the knowledge, training, and experience to harbor a reasonable belief of fraud in the seventh week of his employment).

A reasonable jury could also find that Plaintiff's belief was objectively reasonable given the factual circumstances surrounding his employment at KB Home. Shortly after he began working at KB Home Houston, he discovered that the division had a contract with a vendor who submitted insufficient invoices and was engaged in a personal relationship with a KB Home Houston employee. His superior, Harrington, criticized his efforts to terminate the marketing department's relationship with that vendor as "heavy-handed." When he attempted to collect information about the marketing department's budget, in an effort to educate his staff on expenses, Harrington ordered the vendor spreadsheet "destroyed" and told him that the marketing staff did not need access to budget information. She objected to his communications with her superiors and corporate employees.

Pham, Eubanks, and Sprouse told Plaintiff that the spreadsheet was used for Sarbanes-Oxley compliance. While there is evidence that David Sprouse attempted to explain the spreadsheet's meaning to him, and that he gave him the option of allowing Ahrendt to sign it, there is no evidence that Sprouse, or anyone else, explained to Plaintiff that the information he reported would not be used for Sarbanes Oxley purposes. Indeed, in his conversation with

Ahrendt, Plaintiff refers to the spreadsheet as the "SOX spreadsheet", and Ahrendt does not correct him, or clarify that the information required from him was not used for those purposes. Plaintiff was told that the spreadsheet was "important" and that he had to sign it, even though he felt it was based on incorrect information.  He heard Ahrendt comment that "everyone had to sign the spreadsheet" to avoid a corporate audit and opening "a can of worms."

The day after he met with Zimmerman to discuss the department's spending on D & R signs, and what he believed to be the lack of internal controls with respect to inventory and vendor contracts, Harrington told him that "things were not working out"; Ahrendt supported her, referencing Plaintiff's earlier meeting with Zimmerman.  On the next business day, Harrington issued the PIP.

Given these facts, a reasonable person with Plaintiff's training and background could believe that the company was intentionally violating securities laws.  Plaintiff believed that certain internal controls were being violated, and when he attempted to gather or circulate information regarding these controls, question the accuracy of the company's information, or discuss them with Zimmerman, he was reprimanded, which suggests that Harrington, and possibly Ahrendt, were attempting a cover up.[6]

Under the subjective portion of the reasonableness requirement, the employee must actually believe that the employer violated the relevant law or regulations.  *Van Asdale v. International Game, Technology*, 498 F.Supp.2d 1321, 1333 (D.Nev. 2007).  Defendants contend that Plaintiff did not actually believe that KB Home Houston was intentionally violating securities laws, based on statements Plaintiff made in his deposition.  During this line of questioning, Plaintiff admitted that he had no specific knowledge that Pleasant was submitting

---

[6] Of course, given that the facts in this case are highly disputed, it is equally likely that a reasonable jury could conclude that Harrington and Ahrendt's actions were efforts to enforce the chain of command and prevent Plaintiff from communicating confidential and propriety information.

fraudulent invoices, but that the lack of detail in the submitted invoices amounted to fraud, in his opinion. (Sequeria Dep. 110:15-23.) Additionally, he testified that Pleasant's unauthorized transfer of inventory led him to believe Pleasant's invoices were actually false. (*Id.* at 111:14-22.) Defendant then asked if Plaintiff had specific knowledge that any other vendor payments were fraudulent. Plaintiff responded that "fraud" was "strong" but that there were invoices, such as those submitted by Stan Crane, that were "high" and that "raised questions." He notes that he had a "reasonable belief that these potentially could be fraudulent or inaccurate" and that "all of the vendors" could have submitted fraudulent payments because of the "complete lack of personal controls."

The Court does not interpret these statements to mean that Plaintiff did not believe the company was intentionally violating one of the six enumerated provisions. These statements are better understood as communicating that he did not actually know, but rather suspected, that some vendors were submitting fraudulent invoices, and that the company did not have the proper controls in place to prevent it. It was his employers' reaction to his complaints that caused him to believe the company was intentionally violating securities laws. Plaintiff believes that there is a legal requirement that publicly-held companies should have effective internal controls in place. (*Id.* at 184:17-19.) Indeed, section 13 of the Securities Exchange Act of 1934 requires companies to "devise and maintain a system of internal accounting controls." 15 U.S.C. § 78m(b)(2)(B). Section 13 further states that "No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls." 15 U.S.C. § 78m(b)(3)(B)(5). Plaintiff felt that KB Home Houston did not have such controls in place and that it took steps to frustrate their implementation. (Doc. No. 33, Ex. 2 ¶ 23.) As Plaintiff put it, the division's management was concerned enough to agree that Pleasant should be terminated,

but they still wanted Plaintiff to sign off on the SOX spreadsheet when he believed that the budgets were inaccurate.  (*Id.* at Ex. 2 ¶ 1.)

### 2.  Plaintiff's Protected Activity

Defendants argue that, even if Plaintiff reasonably believed that fraud was occurring, his statements to Zimmerman and Ahrendt did not amount to protected activity.  In order to be protected by the statute, a whistleblower's reporting must implicate the substantive law protected in Sarbanes-Oxley definitively and specifically. Allen, 514 F.3d at 476  (citing *Bozeman v. Per Se Tech.*, Inc., 456 F.Supp.2d 1282, 1359 (N.D.Ga 2006).  General inquires about the company's activities do not rise to the level of protected activity; whistle blowing cannot be vague. *Id*; *Van Asdale v. International Game, Technology*, 498 F.Supp.2d 1321 (D.Nev. 2007).  Additionally, the whistleblower must allege that fraud is occurring, not simply voice a concern that a violation could occur upon some future contingency.  *See Livingston v. Wyeth*, 520 F.3d 344 (4th Cir. 2008); *Walton v. Nova Information Systems*, No. 3:06-CV-292, 2008 WL 1751525 (E.D. Tenn. April 11, 2008).

The plaintiff, however, in reporting suspected fraudulent activity, does not need to identify the specific securities law related to shareholder fraud that is being violated.  *Mahoney*, 2007 WL 805813 at *4.  He or she does not have to expressly state that the company is engaged in illegal conduct, to satisfy section 806.  *See, e.g., Fraser v. Fiduciary Trust Co. Intern.*, 417 F.Supp.2d 310 (S.D.NY. 2006) (holding that the plaintiff's email to executives pointing out that, while New York clients were instructed to sell WorldCom Bonds, LA clients were not, causing them to suffer a great loss, was a sufficient communication, given the context, to constitute protected activity).  Defendants argue that Plaintiff's complaints to Zimmerman and Ahrendt were not sufficiently related to securities law violations to constitute protected activity.  Given

21

the context of Plaintiff's complaints, a reasonable jury could find that Zimmerman and Ahrendt "understood the serious nature" of Plaintiff's allegations. *Bozeman v. Per-Se Technologies, Inc.*, 456 F.Supp.2d at 1359 (citing *Collins*, 334 F.Supp.2d at 1375-76).   He identified specific behavior, regarding vendor contracts, inventory controls, and the SOX spreadsheet.  He expressed concern to Zimmerman that the company did not have adequate internal controls in these areas.  While he did not use the words "internal controls" in his conversation with Ahrendt, he warned him that they "do not know what we don't know" and that the situation with Pleasant was "just the tip of the iceberg."

Defendants argue next that Plaintiff did not engage in protected activity because he only reported non-compliance with company procedures, which is not protected behavior under the statute.  The Defendants rely on the recent Fifth Circuit decision, *Allen v. Administrative Review Bd.*, 514 F.3d 468 (5th Cir. 2008).  In *Allen*, the plaintiff was a Certified Public Accountant who told her superiors that her division's internal consolidated financial statements were not compliant with SAB-101, a SEC Staff Accounting Bulletin.  The plaintiff knew, however, that these statements were only used internally, and that they were not submitted to the SEC or available to shareholders.  The Court of Appeals concluded that since the plaintiff was only making general inquires about the compliance of the company's internal financial documents, which she knew were not released to shareholders,  her activity was not protected under section 806.

We think that the instant case is distinguishable from the facts in *Allen*.  Plaintiff believes, rightly so, that there is a law requiring companies to maintain internal accounting controls.  He believes that KB Home Houston willfully violated this law by failing to follow its own procedures regarding vendor contracts and inventory controls.  He also believes, and there is

evidence to suggest, that the information on the SOX Spreadsheet is used for Sarbanes Oxley compliance. *Collins v. Beaver Homes*, a case with remarkably similar facts, is instructive.   In *Collins*, the plaintiff had been recently hired as the marketing director of a homes manufacturing company when she became concerned with many of the company's internal practices.  She alleged that the company violated many of its own internal accounting controls because, among other things, the division was knowingly overpaying invoices to a vendor because of a personal relationship between management and the vendor.  The Plaintiff was fired shortly after her employment began. *Collins*, 334 F.Supp.2d at 1377.  The district court acknowledged that the connection between the plaintiff's complaints to the substantive law protected in Sarbanes-Oxley was "less than direct"; nevertheless, the district court denied summary judgment because the plaintiff's allegations detailed violations of the company's internal accounting controls in favor of preferential treatment based on personal relationships. *Id.* at 1377-1378.

### ii.  Defendant's Knowledge of Plaintiff's Protected Activity.

The record suggests that a reasonable jury could find that Defendant knew about Plaintiff's alleged protected activity.  Zimmerman, Ahrendt, and Harrington participated in the decision to fire Plaintiff. (Ahrendt Dep. 122:23-24.) Zimmerman had personal knowledge of Plaintiff's complaints regarding internal controls from their September 21 meeting.  Zimmerman also told Ahrendt and Harrington about the meeting, because Ahrendt and Harrington reprimanded Plaintiff for it at the September 22 meeting.  The record before us does not detail exactly what Zimmerman told Ahrendt and Harrington about the September 21 meeting.

Plaintiff also complained to Ahrendt about the Sarbanes Oxley spreadsheet and the company's lack of internal controls.  In the October 4 conversation, which Plaintiff recorded, he alerted Ahrendt that the company did not know "what we do not know" about the Pleasant

invoices, and that it was "just the tip of the iceberg."  Additionally, he expressed concern that he did not have the information he needed to complete the SOX Spreadsheet.  As to the third element of the test, the parties do not dispute that Plaintiff suffered an adverse employment action when he was terminated.

### iii.  Basis for Plaintiff's Termination

Plaintiff must prove that his termination was, at least in part, based on his protected activity.  In the absence of direct evidence of retaliatory intent, our sister courts have looked to the timing of termination in determining whether circumstances exist to suggest the plaintiff's protected activities were a contributing factor in his termination. *Van Asdale*, 489 F.Supp.2d at 1334 (citing *Collins v. Beazer Homes USA, Inc.*, 334 F.Supp.2d 1365, 1379 (N.D.Ga. 2004).  Plaintiff engaged in protected activity on September 21, when he met with Zimmerman to discuss the company's lack of internal controls related to inventory and vendor contracts.  The very next day, Ahrendt and Harrington reprimanded him, warned him that his job was in jeopardy, and specifically referred to his meeting with Zimmerman.  Harrington issued a PIP on the following business day which, among other things, prevented Plaintiff from sending out information without her prior approval.  On October 4, Plaintiff met with Ahrendt and voiced his concern regarding Pleasant's contract, telling Ahrendt "we don't know what we don't know."  He also repeated his concern about his ability to complete the SOX spreadsheet.  Plaintiff was terminated the following day.  Given the close proximity in time between Plaintiff's reported activity and his ultimate termination, a reasonable jury could find that he was fired, in part, because of his protected activity.

### C.  Termination for Reasons Unrelated to Plaintiff's Protected Activity

Defendants contend that, even if Plaintiff establishes a prima facie retaliation claim, there is clear and convincing evidence that Plaintiff would have been terminated for reasons unrelated to his alleged protected activity.  The "clear and convincing" evidence standard is even more stringent that those employers face in other employment discrimination cases. *Mahony v. KeySpan Corp.*, 2007 WL 805813  at *7.  There are too many factual disputes regarding the non-protected aspects of Plaintiff's job performance for us to conclude, as a matter of law, that Plaintiff would have been terminated had it not been for his protected activity

Harrington, Ahrendt, and Zimmerman disapproved of Plaintiff's communication style. Plaintiff also violated the chain of command by meeting with Zimmerman, Ahrendt, and business partners without consulting Hartington.  It is not obvious that this behavior, standing alone, warranted Plaintiff's termination.  *Cf. JDS Uniphase Corp. v. Jennings*, 473 F.Supp.2d 705 (E.D.Va. 2007) (finding clear and convincing evidence that a senior accounting official would have been fired in spite of his protected activity when he had hired a temporary employee, who had worked at his ex-wife's firm, outside the channels of the company's human resources department); *Livingston v. Wyeth*, 520 F.3d  at 350 (finding the same when the plaintiff was discharged after threatening to have the police remove another, uninvited employee from his division's holiday party).  Allowing Defendants to insist that these complaints constituted the only basis for Plaintiff's termination would thwart the purpose of Sarbanes-Oxley.  *See, e.g., Collins*, 334 F.Supp.2d at 1381.  In *Collins*, the plaintiff was also fired after working for several weeks.  The defendant alleged that her termination was based on communication problems.  The district court found that, had it not been not been for the plaintiff's protected activity, these problems might not have arisen in such a short period of employment.

Harrington's assertion that she decided to terminate Plaintiff for failure to comply with the PIP is not persuasive.  Plaintiff was fired only ten days after Harrington issued the PIP.  It required Plaintiff to "follow her instructions" and seek her approval before disseminating information.  She argued that he violated the PIP by attempting to schedule a meeting with Zimmerman without her approval.  Plaintiff asserts, however, that he was never prohibited from meeting with Zimmerman, and that Zimmerman initiated their meetings.  A reasonable jury could find that Plaintiff did not actually violate the PIP, or, if he did so, it was because the PIP's terms were intentionally vague.  Harrington also contends that Plaintiff used a "sarcastic" tone in an email to David Sprouse when, in response to some budget information, he asked Sprouse "did our strategy change?"  A reasonable jury could find that this email was simply an inquiry and did not constitute a violation of the PIP's direction that Plaintiff not respond to emails when frustrated or angry.

### III.   CONCLUSION

For the reasons stated above, a reasonable jury could find that Plaintiff engaged in protected activity, that Defendants knew about his activity, that he suffered an adverse employment action, and that his termination was caused, in part, by his protected activity. Defendants have not presented clear and convincing evidence that Plaintiff's termination would have occurred in the absence of his protected activity.  Defendants' Motion for Summary Judgment is therefore **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the _12th_ day of January, 2009.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS
ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY
AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN
SENT ONE BY THE COURT.**